1

2

3

4

5

6

7

8          **IN THE UNITED STATES DISTRICT COURT**

9          **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   JOHN ANTHONY BUCHANAN,                      CASE NO. CV F 08-00304 LJO WMW HC

12                Petitioner,                    **ORDER APPOINTING THE OFFICE OF**
                                                 **THE FEDERAL DEFENDER AS**
13        vs.                                    **COUNSEL FOR PETITIONER;**
                                                 **DIRECTING CLERK OF COURT TO**
14   L. E. SCRIBNER, et al.,                     **SERVE COPY OF ORDER ON**
                                                 **APPOINTED COUNSEL; SCHEDULING**
15                Respondents.                   **STATUS CONFERENCE**

16                                               DATE:          April 20, 2009
                                                 TIME:          8:15 a.m.
17                                               LOCATION:      2500 Tulare Street,
                                                                Fresno, CA, 93721
18                                                               Courtroom 4
                                                                7th Floor
19   _____/

20

21        On February 22, 2008, John Anthony Buchanan ("Petitioner"), a *pro se* California prisoner, filed

22   a Petition for Writ of Habeas Corpus by a Person in State Custody pursuant to 28 U.S.C. § 2254

23   ("Petition").[1]   On July 9, 2008, L. E. Scribner ("Respondent") filed an Answer to the Petition.  On

24   September 5, 2008, Petitioner filed a Traverse.  Thus, this matter is ready for decision.

25                              <u>**PROCEDURAL HISTORY**</u>

26        On April 5, 2005, a Fresno County Superior Court jury convicted Petitioner of carjacking (Cal.

27   _____

28          [1]      Although petitions for habeas corpus relief are routinely referred to a Magistrate Judge, *see* L.R. 72-302,
     the Court exercises its discretion to address the Petition pursuant to Local Rule 72-302(d).

1

Penal Code § 215(a)) and resisting, obstructing, or delaying a peace officer (*id.* § 148(a)(1)). (Clerk's Tr. ("CT") 109-10, 112.) The jury also found that Petitioner personally used a deadly or dangerous weapon (Cal. Penal Code § 12022(b)). (CT 109.) Petitioner admitted to the fact of two prior juvenile adjudications. (*Id.* 53; Lodged Doc. ("LD") 4 at 2.) On May 3, 2005, the superior court sentenced Petitioner to twenty-seven years to life in state prison. (CT 112.)

On May 17, 2005, Petitioner appealed his conviction and sentence to the California Court of Appeal. (CT 114.) On September 21, 2006, the court of appeal affirmed the judgment in a reasoned opinion. (LD 4.) On November 1, 2006, Petitioner filed a petition for review in the California Supreme Court, which summarily denied the petition on December 13, 2006. (LD 5-6.) Petitioner subsequently filed a petition for writ of certiorari in the United States Supreme Court, which denied the petition on June 4, 2007. *Buchanan v. California*, 127 S. Ct. 2920 (2007).

On February 22, 2008, Petitioner filed his federal Petition in this Court.

## FACTUAL BACKGROUND[2]

> The facts of the underlying offense are not pertinent to the issues on appeal. We briefly summarize them. Jaime Mendoza was driving his truck. He stopped at a stop sign. [Petitioner] opened the passenger door to Mendoza's truck and got in. [Petitioner] held a knife and ordered Mendoza to give him his wallet and get out of the truck. Mendoza jumped out of the truck and ran. [Petitioner] drove the truck away.

(LD 4 at 2.)

## PETITIONER'S CLAIMS

1.  The trial court erred by finding that Petitioner did not establish a prima facie case of racial bias during jury selection pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986) (Pet. 4, 18);[3] and

2.  Use of Petitioner's prior juvenile adjudications as a sentencing enhancement violated his right to jury trial (*id.* 4, 32).

## STANDARD OF REVIEW

The current Petition was filed after the Antiterrorism and Effective Death Penalty Act of 1996,

---

[2]     The Court adopts the factual background from the September 21, 2006, California Court of Appeal opinion on direct review as a fair and accurate summary of the evidence presented at trial. *See* 28 U.S.C. § 2254(e)(1); *Hernandez v. Small*, 282 F.3d 1132, 1135 n.1 (9th Cir. 2002).

[3]     For ease of reference, the Court utilizes the CM/ECF pagination for the Petition.

Pub. L. No. 104-132, 110 Stat. 1214 ("AEDPA"), was signed into law and is thus subject to its provisions. *See Lindh v. Murphy*, 521 U.S. 320, 326-327 (1997). The standard of review applicable to Petitioner's claims is set forth in 28 U.S.C. § 2254(d), as amended by the AEDPA:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under the AEDPA, the "clearly established Federal law" that controls federal habeas review of state court decisions consists of holdings (as opposed to dicta) of Supreme Court decisions "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). To determine what, if any, "clearly established" United States Supreme Court law exists, the court may examine decisions other than those of the United States Supreme Court. *LaJoie v. Thompson*, 217 F.3d 663, 669 n.6 (9th Cir. 2000). Ninth Circuit cases "may be persuasive." *Duhaime v. Ducharme*, 200 F.3d 597, 598 (9th Cir. 2000) (as amended). On the other hand, a state court's decision cannot be contrary to, or an unreasonable application of, clearly established federal law if no Supreme Court precedent creates clearly established federal law relating to the legal issue the habeas petitioner raised in state court. *Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir. 2004); *see also Carey v. Musladin*, 549 U.S. 70, 76-77 (2006).

A state court decision is "contrary to" clearly established federal law if the decision either applies a rule that contradicts the governing Supreme Court law, or reaches a result that differs from the result the Supreme Court reached on "materially indistinguishable" facts. *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam); *Williams*, 529 U.S. at 405-06. When a state court decision adjudicating a claim is contrary to controlling Supreme Court law, the reviewing federal habeas court is "unconstrained by § 2254(d)(1)." *Williams*, 529 U.S. at 406. However, the state court need not cite or even be aware of the controlling Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8.

3

State court decisions which are not "contrary to" Supreme Court law may only be set aside on federal habeas review "if they are not merely erroneous, but 'an *unreasonable* application' of clearly established federal law, or are based on 'an *unreasonable* determination of the facts.'" *Early*, 537 U.S. at 11 (*quoting* 28 U.S.C. § 2254(d)). Consequently, a state court decision that correctly identified the governing legal rule may be rejected if it unreasonably applied the rule to the facts of a particular case. *Williams*, 529 U.S. at 406-10, 413; *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002) (per curiam). However, to obtain federal habeas relief for such an "unreasonable application," a petitioner must show that the state court's application of Supreme Court law was "objectively unreasonable." *Woodford*, 537 U.S. at 24-25, 27. An "unreasonable application" is different from an "erroneous" or "incorrect" one. *Williams*, 529 U.S. at 409-10; *see also Waddington v. Sarausad*, 129 S. Ct. 823, 831 (2009); *Woodford*, 537 U.S. at 25.

A state court factual determination must be presumed correct unless rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Furthermore, a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005).

## DISCUSSION

### Claim One

In his first claim, Petitioner contends the trial court erred by finding that he did not establish a prima facie case of racial bias during jury selection pursuant to *Batson*. (Pet. 4, 18-31.) Petitioner states that the prosecutor's exercise of peremptory strikes against three Hispanic-surnamed prospective jurors violated *Batson*. (*Id.* 23, 28-31.) Because the California Supreme Court summarily denied this claim, the Court must "look through" to the last reasoned decision, that of the California Court of Appeal on direct review. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-05 (1991). In rejecting Petitioner's claim, the court of appeal stated:

> The People exercised three peremptory challenges of the potential jurors. All three of the challenges were to jurors with Hispanic surnames: jurors Nos. 7, 11, and 12. [Petitioner] contends the trial court erred in failing to find a prima facie case of group bias on the part of the prosecutor.
> ### a. Test for a Prima Facie Case
> The California Constitution and the United States Constitution prohibit the exercise of peremptory challenges solely because of group bias. (*Batson v. Kentucky*

(1986) 476 U.S. 79; *People v. Wheeler* (1978) 22 Cal.3d 258.) When a defendant believes the prosecution is exercising peremptory challenges in violation of the Constitution, the trial court must follow this procedure: "First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citations.] Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. [Citations.] Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide ... whether the opponent of the strike has proved purposeful racial discrimination.' [Citation.]" (*Johnson v. California, supra,* 545 U.S. at p. ___ [125 S.Ct. at p. 2416], fn. omitted.)

In *People v. Johnson* (2003) 30 Cal.4th 1302, the California Supreme Court held that the test for establishing a prima facie case of group bias is that "the objector must show that it is more likely than not the other party's peremptory challenges, if unexplained, were based on impermissible group bias." (*Id.* at p. 1306.)

Limited to the question regarding the applicable test to establish a prima facie case, the United States Supreme Court granted certiorari and in *Johnson v. California, supra,* 545 U.S. 162 (*Johnson*), held that "California's 'more likely than not' standard is an inappropriate yardstick by which to measure the sufficiency of a prima facie case." (*Id.* at p. ___, [125 S.Ct. at p. 2416].) The court found the appropriate standard to be that "a defendant satisfies the requirements of *Batson's* first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." (*Id.* at p. ___, [125 S.Ct. at p. 2417].)

**b. Jury Selection**

The jurors in this case were selected from a panel of 75 potential jurors. Approximately one-third of the panel of 75 had names that would suggest they were Hispanic. At the outset of jury selection, 12 potential jurors were seated in the jury box and another six potential jurors were seated in front of the box. Four of the potential jurors seated in the box and two of the potential jurors in the group of six outside of the box had Hispanic surnames.

The court and counsel questioned the group of 18 potential jurors. The jurors were questioned in the usual manner regarding their knowledge about the case, whether they knew anyone involved in the case, whether they had any preconceived beliefs or biases about the case, whether they would follow the court's instructions, and other general routine questions. Potential juror No. 4 was excused after she responded that she was a personal friend of one of the witnesses. None of the other potential jurors answered any of the questions in a manner that would indicate a potential problem.

Several of the potential jurors had relatives or in-laws in law enforcement. Several jurors had prior jury experience. Up to this point in jury selection, potential jurors Nos. 7, 11 and 12 did not answer any of the questions in a affirmative manner requiring further elucidation. Potential jurors Nos. 7, 11 and 12 were seated in that order in the jury box.

The potential jurors were asked if they, any family members, or any close friends had been arrested for any offenses. No. 12 stated she had family and acquaintances who have been arrested for driving under the influence, as well as some acquaintances that have been arrested for drugs and weapon possessions. She commented they were treated fairly and there was nothing in those experiences that would make it difficult for her to be fair and impartial to both sides. Other potential jurors had family or friends involved with criminal charges.

The potential jurors were asked if any of them, their family members, their friends, or their acquaintances had been the victims of any crime. Several potential jurors responded to this question, including Nos. 11 and 12. No. 11 stated that he was a victim of identity theft in December of 2003. A person who lived in his apartment complex was arrested for the crime. The court asked if No. 11 followed the case; he said he did not. No. 11 was asked if the arrested individual was convicted; No. 11 did not recall. No. 11

had no complaints about how the matter was handled.

No. 12 said that her godfather's son was murdered a few years back in Arizona. The victim had been stabbed. She recalled that someone was arrested. When asked if justice had been served, she believed so, but she did not really follow up on it. There was nothing about this case that would make it difficult for her to be fair and impartial.

The jurors were each asked to give an individualized statement regarding their marital status, living arrangements, careers, and information about the individuals living in their household.

No. 7 stated: "I've lived in the Kerman area for the last ten years. I've never been married. I'm not married. I have a three-year-old son. I graduated [from] high school and I currently attend business school right now. I've been a security guard for three years and worked in the security business for four. I just spend my time with my son."

No. 11 gave the following personal statement: "I've lived in Fresno for the last five years and Kingsburg the prior five. I am married for the last two years. I have no children. I have a bachelor of science in accounting and studying for my C.P.A. My wife is finishing her master's degree. I've been working in finance and accounting the last eight years, and prior to that I was a student. And my wife is an adjunct professor for a university in town and also an administrator, and she's been doing that for about six, seven years now. There are not any other adults in my home and I typically spend time either traveling for leisure or working on my house."

No. 12 made the following statement: "[F]or the past two years I've been living out in Riverdale. Before that I was living in Gilroy near the Bay area. I am married. I've been married for ten years, no children.

"And my educational background is I finished high school and did about a year of college. My spouse, he only finished elementary school. And during the past ten years I've been working with – as a community health aid and customer service representative before that for about six years. And my spouse, right now he's working on our ranch that we have. And for the past two years, and then before that he worked for Wright Brothers, which is the company that makes barrels, and no other adults in the home. And usually in our leisure time we travel back to the Bay area to visit family."

After the voir dire of the first 18 people was concluded, the People began their peremptory challenges. The People first challenged No. 12. He was replaced with No. 14. [Petitioner] challenged No. 6 was replaced with No. 15. No. 15 had a Hispanic name. No. 11 was the next person challenged by the People.

After No. 11 was excused by the People, [Petitioner] asked for a sidebar conference. This conference was not recorded. No. 11 was replaced by No. 16. No. 16 had a Hispanic surname.

The challenges resumed with [Petitioner] challenging No. 5. No. 5 was replaced with No. 17. The People then challenged No. 7. No. 7 was replaced by No. 18. [Petitioner] and the People then accepted the jury. At this time, three Hispanic persons or persons with Hispanic surnames were seated on the jury. No. 10 was one of the sworn jurors. No. 10 had a Hispanic surname and had remained as one of the original prospective jurors in the box from the outset.

Seven people were questioned for the alternate juror positions. Two of the seven had Hispanic surnames. Neither the People nor the [Petitioner] made any challenges to the prospective alternate jurors. No. 22, who has a Hispanic surname, and No. 26 were seated as the two alternate jurors.

### c. Discussion

[Petitioner] contends there are two reasons supporting his argument that the trial court erred in denying his *Batson/Wheeler* motion. First, he argues that at the time of jury selection California's standard for establishing a prima facie case was contrary to the standard now required by the United States Supreme Court. Because the trial court was bound at that time to follow the California standard, [Petitioner] asserts that de novo review is appropriate in this appeal.

As previously set forth, the standard for the trial court to apply in determining if

6

a defendant has shown a prima facie case of group bias is now different from the standard that was in effect at the time of [Petitioner]'s trial. The record is silent as to what standard the court applied in denying the *Batson/Wheeler* motion. The trial court stated, "At that time [the time of the sidebar] the court found that there was no prima facie evidence indicating *Batson-Wheeler* issues."

The California Supreme Court has, in several cases, determined *Batson/Wheeler* issues post- *Johnson* in situations similar to what occurred here (the trial was pre-*Johnson* and the record does not demonstrate what standard was used) by conducting its own review of the record. The review proceeds on the assumption, arguendo, that the trial court's decision is not entitled to deference. The California Supreme Court reviews the record, applies the *Johnson* standard, and resolves the legal question "whether the record supports an inference that the prosecutor excused a juror on the basis of race." (*People v. Cornwell* (2005) 37 Cal.4th 50, 73; *People v. Gray* (2005) 37 Cal.4th 168, 187; *People v. Avila* (2006) 38 Cal.4th 491, 554.) Accordingly, we apply that same standard of review in this case.

[Petitioner]'s second argument is that the prosecution's exercise of three peremptory challenges, all of Hispanic persons, establishes a prima facie case of group bias and requires that we reverse this case for a new trial.

We begin by stating that our review is limited to the prosecutor's challenges to No. 11 and No. 12. There was only one sidebar conference during jury selection. It occurred immediately following the People's excusal of No. 11, and after the People had previously excused No. 12. The jury was accepted by the People and by [Petitioner] with no further sidebar conferences or objections. After the jury was sworn and the alternates were selected, defense counsel stated, "And, Your Honor, before we go off the record, should we discuss that we had an issue of the jurors and the court found that there–" The court responded as previously set forth, "At that time [the time of the sidebar] the court found that there was no prima facie evidence indicating *Batson-Wheeler* issues."

Because [Petitioner] did not raise a *Batson/Wheeler* issue regarding the People's challenge to No. 7, we need not consider the challenge to No. 7 in our analysis.

Other than the list of names of the prospective jurors and the chart showing the names of the jurors selected to sit on this jury, there is nothing in the record demonstrating ethnicity of the potential jurors, the challenged jurors, or the seated jurors. When making a *Batson/Wheeler* motion the defendant "should make as complete a record of the circumstances as is feasible." (*People v. Wheeler*, *supra*, 22 Cal.3d at p. 280.) The defendant must also "'establish that the persons excluded are members of a cognizable group within the meaning of the representative cross-section rule.'" (*People v. Morris* (2003) 107 Cal.App.4th 402, 408.) Although the record is scant on the above requirements, respondent does not raise this defect in its response to [Petitioner]'s argument, and therefore we will assume that the requirements of a sufficient record and a cognizable group were met.

In *Johnson*, the defendant was Black and the victim was a 19-month-old White child. After prospective jurors had been removed for cause, 43 eligible jurors remained. Of the 43 remaining prospective jurors, three were Black. After the prosecutor exercised "the second of his three peremptory challenges against the prospective black jurors, defense counsel objected on the ground that the challenge was unconstitutionally based on race." (*Johnson*, *supra*, 545 U.S. at p. ___ [125 S.Ct. at p. 2414].) The trial judge found that a prima facie case had not been established. The judge warned the prosecutor that "we are very close." (*Ibid.*)

The next day the prosecutor struck the final remaining prospective Black juror and defense counsel made another motion. The trial court did not ask the prosecutor to explain his challenges but instead examined the record and stated that it was convinced the prosecutor's strikes could be justified by race-neutral reasons. (*Johnson*, *supra*, 545 U.S. at p. ___ [125 S.Ct. at p. 2414].)

After determining that the California courts were applying the wrong standard to determine whether a defendant had made a prima facie case, the *Johnson* court found that

a prima facie case had been shown. "In this case the inference of discrimination was sufficient to invoke a comment by the trial judge 'that "we are very close,"' and on review, the California Supreme [Court] acknowledged that 'it certainly looks suspicious that all three African-American prospective jurors were removed from the jury.' [Citation.] Those inferences that discrimination may have occurred were sufficient to establish a prima facie case under *Batson*." (*Johnson*, *supra*, 545 U.S. at p. ___ [125 S.Ct. at p. 2419].)

In the case here, there are no comments by the trial court indicating that the People were teetering on the brink of a prima facie case. In addition, numerous Hispanics remained on the panel of prospective jurors.

[Petitioner] places great reliance on *U.S. v. Alanis* (9th Cir. 2003) 335 F.3d 965 to support his position that a statistical analysis of jury selection was sufficient to raise an inference of discriminatory purpose. In *Alanis*, the prosecutor exercised six peremptory challenges. All of the challenges were to men. Defense counsel objected. The court found that defendant had made a prima facie showing that peremptory challenges had been exercised on the basis of gender. The People were then asked to provide their neutral-based reasoning for doing so. The circuit court held that the trial court erred in not proceeding to the third required step in the process because it failed "to announce a deliberate decision accepting or rejecting the claim of purposeful discrimination." (*Id.* at p. 967.) In reaching this decision the circuit court stated, "[t]he district court properly conducted steps one and two of the three-step *Batson* process after defense counsel's original objection." (*Ibid.*)

*Alanis* does not aid [Petitioner]'s position because in *Alanis* the district court found a prima facie case; thus the circuit court had no reason to reevaluate that finding on appeal.

[Petitioner] also relies on *Tankleff v. Senkowski* (2d Cir. 1998) 135 F.3d 235. In *Tankleff* the circuit court found that "the fact that the government tried to strike the only three blacks who were on the panel constitutes a sufficiently dramatic pattern of actions to make out a prima facie case." (*Id.* at p. 249.) *Tankleff* is easily distinguishable because here numerous Hispanic, or Hispanic-surnamed individuals, remained on the panel, and at the time of the motion two Hispanic potential jurors were in the jury box.

The circumstances here are more akin to the California Supreme Court case of *People v. Gray*, *supra*, 37 Cal.4th 168. In *Gray*, the defendant claimed the prosecutor "violated his state and federal constitutional rights by using peremptory challenges to excuse two prospective jurors because they were African-American. [Citations.]" (*Id.* at p. 183.) The Supreme Court rejected his claim. "That prospective Jurors R.H. and B.J., both African-Americans, belonged to a cognizable class is not disputed on appeal [citation] nor does either party dispute that the issue was timely raised and the record is as complete as was feasible. Defendant relies on certain facts that, he claims, raise an inference of discriminatory intent. He first contends, '[t]he almost total absence of Black jurors suggests that [Jurors R.H. and B.J.] were improperly excluded.' Defendant overstates the case. The prosecutor excluded one African-American juror from the regular jury, but left another on, and struck one African-American from the panel of alternates, but left another on. As defendant concedes, the regular jury was composed of nine White jurors, one African-American juror, and two Latino jurors. The panel of eight alternate jurors was composed of six White jurors, one African-American, and one Latino juror. After examining 'the totality of the relevant facts' [citation], we conclude the exclusion of two African-American jurors and the retention of two failed to raise an inference of racial discrimination. (*People v. Box* (2000) 23 Cal.4th 1153, 1188-1189 [that all excluded jurors were African-American is not necessarily dispositive in establishing a prima facie case]; *People v. Davenport* [(1995)] 11 Cal.4th [1171, 1204] [showing that 'three of the six challenged prospective jurors had Hispanic surnames' was 'insufficient'].)

"Defendant also argues the prosecutor's decision to excuse two of the six African-Americans in the venire of itself suggests bias. When the prosecutor challenged

8

Juror R.H., of course, that juror was only one of three peremptory challenges the prosecutor had thus far exercised. The trial court did not know whether the prosecutor would remove additional racial minorities from the jury. Moreover, as noted above, although the prosecutor eventually challenged and had removed from the panel a total of two African-Americans, two more remained. We conclude the removal of two African-American jurors in these circumstances failed to raise a reasonable inference of racial discrimination. (See *People v. Snow* (1987) 44 Cal.3d 216, 225 [that the prosecutor accepted a jury containing minorities 'may be an indication of the prosecutor's good faith in exercising his peremptories, and may be an appropriate factor for the trial judge to consider in ruling on a *Wheeler* objection, [although] it is not a conclusive factor'].)" (*People v. Gray, supra*, 37 Cal.4th at pp. 187-188, fn. omitted.)

The statistical circumstances of the prosecution's peremptory challenges here was [sic] not sufficient to raise an inference of discriminatory purpose.[4]

(LD 4 at 2-11.)

The Supreme Court "consistently and repeatedly has reaffirmed that racial discrimination by the State in jury selection offends the Equal Protection Clause." *Miller-El v. Dretke*, 545 U.S. 231, 238 (2005) (citations and internal quotation marks omitted). In *Batson v. Kentucky*, the Supreme Court provided a three-step process for a trial court to use in adjudicating a claim that a peremptory challenge was based on race:

First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race[; s]econd, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question[; and t]hird, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

*Snyder v. Louisiana*, 128 S. Ct. 1203, 1207 (2008) (citation and internal quotation marks omitted); *see Batson*, 476 U.S. at 96-98.

At the first stage of the *Batson* analysis, "the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.'" *Johnson v. California*, 545 U.S. 162, 168 (2005) (*quoting Batson*, 476 U.S. at 93-94). "This is a burden of production, not a burden of persuasion." *United States v. Collins*, 551 F.3d 914, 919 (9th Cir. 2009) (*quoting Green v. Lamarque*, 532 F.3d 1028, 1029 (9th Cir. 2008)); *accord Johnson*, 545 U.S. at 170 ("We did not intend the first step to be so onerous that a defendant would have to persuade the judge—on

---

4    [California Court of Appeal footnote 1:] [Petitioner] contends that comparative analysis is a tool that may be used on appeal to determine if [Petitioner] has made out a prima facie case, regardless of whether such analysis occurred in the trial court. The California Supreme Court has not determined this issue. (See *People v. Cornwell, supra*, 37 Cal.4th at p. 71; *People v. Lewis* (2006) 39 Cal.4th 970.) [Petitioner] does not attempt a comparative analysis on appeal; we therefore need not resolve this question.

9

the basis of all the facts, some of which are impossible for the defendant to know with certainty-that the challenge was more likely than not the product of purposeful discrimination."). "[A] defendant satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." *Johnson*, 545 U.S. at 170.

The test for a prima facie case of discrimination is whether the defendant has shown that: "(1) the prospective juror is a member of a cognizable racial group, (2) the prosecutor used a peremptory strike to remove the juror, and (3) the totality of the circumstances raises an inference that the strike was motivated by race." *Collins*, 551 F.3d at 919 (*quoting Boyd v. Newland*, 467 F.3d 1139, 1143 (9th Cir. 2006)); *accord Johnson*, 545 U.S. at 169. The Supreme Court has stated that a prima facie case of discrimination can be made by "offering a wide variety of evidence," which could be "relying solely on the facts concerning [the selection of the venire] *in* [the defendant's] *case*." *Johnson*, 545 U.S. at 169 & n.5. "A pattern of striking panel members from a cognizable racial group is probative of discriminatory intent, but a prima facie case does not require a pattern because the Constitution forbids striking even a single prospective juror for a discriminatory purpose." *Collins*, 551 F.3d at 919 (internal quotation marks omitted); *accord Snyder*, 128 S. Ct. at 1208.

Standard of Review to *Batson* Claim

As a preliminary matter, the Court notes that the California Court of Appeal explicitly stated that it did not consider the prosecutor's third stricken prospective juror in its *Batson* analysis individually or collectively in relation to the other stricken Hispanic-surnamed jurors. (*See* LD 4 at 7, 8.) Thus, the court of appeal found that Petitioner did not show a prima facie case of racial discrimination, *but only as to the first two jurors*. (*Id.* at 9, 11.) Petitioner's *Batson* claim, as indicated in the instant federal Petition, his opening brief to the court of appeal, and in his petition for review to the California Supreme Court, argues that it was the prosecutor's peremptory challenges to three Hispanic-surnamed jurors, and not just the prosecutor's first two peremptory challenges, that constituted racial discrimination during jury selection. (*See* Pet. 4, 28-31; LD 1 at 11, 16-19; LD 5 at 10, 12-14.)

In addition, the trial court did not elaborate its denial of Petitioner's *Batson* claim, stating only "At that time . . . the court found that there was no prima facie evidence indicating *Batson-Wheeler* issues." (*See* LD 4 at 7, 8.) The "time" that the trial court refers appears to be the sidebar conference

10

between counsel and the trial court after the prosecutor's second peremptory challenge. (*See* Rep.'s Tr. on Augment ("RT") 54.) However, Petitioner did not object or request a sidebar conference after the prosecution's third peremptory challenge. (*See id.* 55.) The record also does not indicate that Petitioner made a formal *Batson* motion after voir dire. Thus, it appears the trial court, like the court of appeal, did not conduct a *Batson* analysis for all three of the prosecutor's challenged prospective jurors.

Respondent does not address these apparent issues with regard to the court of appeal's abridged analysis or to the trial court's adjudication. Indeed, Respondent appears to address Petitioner's *Batson* claim in the context of all three of the prosecutor's challenged jurors. (*See* Answer 6, 17-18.) In addition, Respondent does not raise an affirmative defense of procedural default or address any alleged procedural bar utilized by the California Court of Appeal in declining to analyze the third challenged juror. *See Trest v. Cain*, 522 U.S. 87, 89 (1997) ("[P]rocedural default is normally a 'defense' that the State is 'obligated to raise' and 'preserv[e]' if it is not to 'lose the right to assert the defense thereafter.'" (*quoting Gray v. Netherland*, 518 U.S. 152, 166 (1996))); *Franklin v. Johnson*, 290 F.3d 1223, 1232-33 (9th Cir. 2002) (finding State's waiver of procedural default survives the AEDPA); *see also Morrison v. Mahoney*, 399 F.3d 1042, 1046 (9th Cir. 2005) ("[T]he defense of procedural default should be raised in the first responsive pleading in order to avoid waiver.").

In determining the proper standard of deference to the reasoned decision of the California Court of Appeal, "when it is clear that a state court has not reached the merits of a properly raised issue, we must review it de novo." *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).[5] Because the state courts did not address Petitioner's *Batson* claim as to the three Hispanic-surnamed jurors, the Court conducts a de novo review of this claim. *See Lewis v. Mayle*, 391 F.3d 989, 996 (9th Cir. 2004) (utilizing de novo review when state court reached merits of petitioner's conflict of interest claim but did not resolve issue of waiver in examination of claim); *id.* (declining to give "independent reading of the record" because the state court "was not silent as to its reasoning" and declined petitioner's claim

---

[5]	Respondent admits that Petitioner has exhausted his *Batson* claim. (*See* Answer 2.) As discussed, this is confirmed by Petitioner's presentation of his *Batson* claim as to the three Hispanic-surnamed jurors to the California Court of Appeal and the California Supreme Court. (*See* LD 1 at 11, 16-19; LD 5 at 10, 12-14.)

on other non-procedural grounds).[6]  However, "under AEDPA, factual determinations by the state court are presumed correct and can be rebutted only by clear and convincing evidence."  *Pirtle*, 313 F.3d at 1168; *see* 28 U.S.C. § 2254(e)(1).

<u>Merits</u>

Here, the first two elements of a prima facie case do not appear to be in dispute; the three challenged Hispanic-surnamed prospective jurors (Juror Nos. 7, 11, and 12) are members of a cognizable racial group (*see* Sealed Suppl. Clerk's Tr. ("SSCT") 9),[7] and the prosecutor used his peremptory strikes to remove these jurors (*see id.*).  *Collins*, 551 F.3d at 919.  At issue is whether Petitioner has established that the "totality of the relevant facts gives rise to an inference of discriminatory purpose."  *Johnson*, 545 U.S. at 168.

The existence of a pattern of striking minority panel members is a relevant consideration that may raise an inference of discrimination.  *Collins*, 551 F.3d at 921 (*citing Batson*, 476 U.S. at 96-97).  An inference of discrimination can occur where the prosecutor strikes a large number of panel members from the same racial group, or where the prosecutor uses a disproportionate number of strikes against members of a single racial group.  *Id.*; *see Fernandez v. Roe*, 286 F.3d 1073, 1078 (9th Cir. 2002). Statistical disparities alone can provide the defendant a prima facie case of juror discrimination.  *See Fernandez*, 286 F.3d at 1078 (*citing Turner v. Marshall*, 63 F.3d 807, 813 (9th Cir. 1995), *overruled on other grounds*, *Tolbert v. Page*, 182 F.3d 677,685 (9th Cir. 1999) (en banc)).

As stated by the court of appeal and indicated by the sealed prospective jury list, approximately one third of the seventy-five prospective jurors in the entire juror pool had Hispanic surnames.  (*See* SSCT 9-12.)  The first twelve prospective jurors were seated in the jury box, and the next six were seated in front of the jury box.  (RT 2-3; SSCT 13.)  Juror No. 4, without a Hispanic surname and in the jury box, was excused by the trial judge for cause and replaced with Juror No. 19, without a Hispanic

---

[6]     The Court's de novo review is also supported by the fact that a prosecutor's striking of even just one prospective juror for a racially discriminatory purpose is sufficient for a constitutional violation under *Batson*, see *Collins*, 551 F.3d at 919, such that the Court cannot give deference to the state courts' decision not to address the third challenged juror individually or collectively in relation to the other challenged Hispanic-surnamed jurors.

[7]     Discriminatory intent may be inferred from a prosecutor's use of peremptory challenges to strike jurors with Hispanic surnames.  *See Sims v. Brown*, 425 F.3d 560, 575 (9th Cir. 2005) (Hispanic-surnamed prospective jurors); *see also Hernandez v. New York*, 500 U.S. 352, 358 (1991) (same).

surname.  (*See* RT 9-10; SSCT 9.)  Juror No. 13, without a Hispanic surname, was not present prior to the peremptory challenges, resulting in five prospective jurors in front of the jury box.  (*See* CT 42; SSCT 9, 13.)[8]  Thus, before counsel exercised their peremptory challenges, 33.3% of the prospective jurors in the jury box (four of twelve) and 40% of the prospective jurors in front of the box (two of five) had Hispanic surnames, or in other words, 35.3% (six of seventeen) of the prospective jurors in and in front of the jury box had Hispanic surnames.  (SSCT 9, 13.)  The prosecutor used all his peremptory strikes, three out of three (100%), against prospective jurors with Hispanic surnames.  (RT 53-55; SSCT 9.)  The prosecutor's three peremptory challenges struck 75% (three of four) of the twelve original prospective jurors in the jury box with Hispanic surnames and 50% (three of six) of the seventeen prospective jurors with Hispanic surnames.

Defense counsel struck two prospective jurors without Hispanic surnames from the jury box.  (RT 54-55; SSCT 9.)  After the exercise of peremptory challenges by counsel and the replacement of jurors with and without Hispanic surnames from the five in front of the jury box, the resulting twelve-person jury contained three jurors with Hispanic surnames, or 25% of the jury.  (*See* SSCT 13.)  Thus, the composition of jurors in the jury box with Hispanic surnames declined from 33.3% (four of twelve) before the challenges to 25% (three of twelve) after the challenges.

Counsel did not exercise any peremptory challenges against the prospective alternate jurors.  (RT 71-73, 76; SSCT 9-10.)  The two alternate jurors that were sworn had Hispanic surnames.  (SSCT 9, 13.)  The record does not reflect, and the parties to not acknowledge, that any alternate jurors replaced the seated jury during trial.  (*See* CT 53 (excusing alternate *jurors* prior to jury deliberation).)

Although the final composition of the jury containing Hispanic-surnamed jurors only declined from 33.3% to 25%, the prosecutor exercised 100% of his peremptory challenges on three Hispanic-surnamed jurors, which resulted in 75% of the original jurors with Hispanic surnames being stricken from the jury box and 50% of the first seventeen prospective jurors with Hispanic surnames being stricken.  This disparity is made further evident when comparison is made of the prosecutor's strikes to

---

[8]    The words "No Show" are written next to Juror No. 13 in the sealed prospective juror list (*see* SSCT 9), and the trial minutes indicate Juror No. 13 did not answer roll call before the initiation of peremptory challenges (*see* CT 42). Juror No. 13 was never in the jury box.  (*See* SSCT 9, 13.)

Hispanic-surnamed jurors (75% of the jury box and 50% of the venire) to the proportion of original prospective jurors with Hispanic surnames in the jury box (33.3%) and the proportion of jurors with Hispanic surnames in the venire (35.3%) and the entire pool (approximately one third). The fact that Hispanic-surnamed jurors were on the final jury does not alleviate the inference of discrimination from the prosecutor's strikes. *See Collins*, 551 F.3d at 919 (reiterating that the exclusion of even a single minority juror on account of race would constitute a *Batson* violation); *Turner*, 63 F.3d at 811-13 (finding prima facie case of discrimination despite the presence of four African-Americans on the seated jury); *see also Williams v. Runnels*, 432 F.3d 1102, 1109 (9th Cir. 2006) (stating that although the prosecutor accepted the jury containing African-Americans several times before exercising his peremptory challenges, this "does not refute the inference that when the prosecutor did make peremptory challenges, he did so in a purposefully discriminatory manner").

From statistical analysis alone, it appears that an inference of juror discrimination has been established by three different statistics: (1) the percentage of peremptory challenges used against Hispanic-surnamed jurors, (2) the percentage of available Hispanic-surnamed jurors challenged in the jury box, and (3) the percentage of available Hispanic-surnamed jurors challenged in the seventeen-person venire. *See Fernandez*, 286 F.3d at 1078-80 (finding inference of racial discrimination when the prosecutor struck four out of seven (57%) Hispanics when Hispanics constituted 12% of the venire and the prosecutor utilized 21% (four out of nineteen) of the prospective juror challenges against Hispanics); *Turner*, 63 F.3d at 813 (finding prima facie *Batson* violation where the prosecution exercised peremptory challenges to exclude five out of nine (56%) African-American jurors when African-Americans comprised 30% of the voir dire and the prosecutor utilized five out of nine (56%) of the challenges against African-Americans).

Although using statistical analysis alone shows an inference of discrimination, other relevant facts in determining whether a prima facie case is met are a prosecutor's questions and statements to the venire because they might provide insight into his motive. *Collins*, 551 F.3d at 921 (*citing Batson*, 476 U.S. at 97). "Likewise, the fact that the prosecutor fails to 'engage in meaningful questioning of any of the minority jurors' might indicate the presence of discrimination." *Id.* (*quoting Fernandez*, 286 F.3d at 1079). Here, the trial judge asked the majority of the questions, and also asked the prospective jurors

to state the answers from their questionnaires. After the trial judge and defense counsel asked their questions, the prosecutor asked several questions to the prospective jurors collectively, which included questions regarding the weight of evidence and reasonable doubt. (RT 50-51.) The prosecutor asked only one direct question, which was directed to Juror No. 19, without a Hispanic surname. (*Id.* 51-52.) That question dealt with the prospective juror's prior contact with law enforcement after being the victim of car theft. (*Id.*) The fact that the prosecutor did not ask any of the Hispanic-surnamed jurors any direct questions adds to the inference of discrimination. *See Collins*, 551 F.3d at 922 (finding fact that prosecutor did not pursue further questioning before striking the only remaining African-American panel member added to the inference of discrimination).

Furthermore, another tool for "conducting meaningful . . . review of whether a prima facie case has been established" is comparative juror analysis, which "involves comparing the characteristics of a struck juror with the characteristics of other potential jurors, particularly those jurors whom the prosecutor did not strike." *Collins*, 551 F.3d at 921-22 (*citing Miller-El*, 545 U.S. at 241, 247-48; *Boyd*, 467 F.3d at 1149-50). "An inference of discrimination may arise when two or more potential jurors share the same relevant attributes but the prosecutor has challenged only the minority juror." *Id.* at 922.[9] Juror Nos. 7, 11, and 12 are the Hispanic-surnamed prospective jurors Petitioner alleges the prosecutor struck with a racially discriminatory purpose. (*See* SSCT 9.) The Court will compare the characteristics of Juror Nos. 7, 11, and 12 to those similarly situated jurors without Hispanic surnames that were seated on the final jury.[10]

Juror No. 7's only response to the trial court's questions was to the court's request that the jurors each give an individualized statement regarding their marital status, living arrangements, careers, and information about the individuals living in their household. (RT 30.) Juror No. 7 had never been married, had a three-year-old son, graduated from high school, and currently attended business school. (*Id.* 36.) Juror No. 7 had been a security guard for three years and worked in the security business for

---

[9] As a threshold matter, the Court notes that there is no requirement that jurors be identically situated in order for meaningful comparison to take place. *See Miller-El*, 545 U.S. at 247 n.6; *Collins*, 551 F.3d at 922 n.3.

[10] The following jurors without Hispanic surnames were seated on the final jury: Juror Nos. 1, 2, 3, 8, 9, 14, 17, 18, and 19. (*See* SSCT 9, 13.)

four. (*Id.*) She spent her time with her son. (*Id.*) Although there were no jurors without Hispanic surnames that had never been married but had children, several jurors without Hispanic surnames were either divorced or widowed with children.

As for Juror No. 11, when the potential jurors were asked if any of them, their family members, their friends, or their acquaintances had been the victims of any crime, Juror No. 11 stated he was the victim of identity theft in December 2003. (RT 26.) A person that lived in his apartment complex was arrested for the crime. (*Id.*) When asked if Juror No. 11 followed the case, he said he did not. (*Id.*) When asked if the arrested individual was convicted, Juror No. 11 did not recall. (*Id.*) Juror No. 11 had no complaints about how the matter was handled. (*Id.* 26-27.) Other jurors without Hispanic surnames had been or had known victims of any crime: Juror No. 19 stated her truck was broken into in 1998 and stolen in 1999, that no one was arrested for these crimes, that she believed law enforcement could have done more to solve the crimes, but that that would not affect her judgment in Petitioner's case (RT 22-23); Juror No. 9 stated her was car stolen from her workplace, that it was recovered but needed significant repair and was covered by insurance, that she believed law enforcement did all they could, and that she could be fair and impartial (*id.* 24); Juror No. 1 stated her daughter was severely assaulted ten years prior, that her daughter was still recovering, that she felt the person convicted of the crime should have had a greater punishment, and that she believed she would be fair and impartial (*id.* 28-29). Judging from the responses of jurors without Hispanic surnames, some had been or knew victims of crimes that may have been more and/or less heinous than Juror No. 11's identity theft, and the prosecutor did not strike any of these jurors.

As for Juror No. 11's background, he had been married for two years, had no children, had a degree in accounting, and was studying for a CPA. (RT 37.) His wife was finishing her master's degree. (*Id.*) Juror No. 11 was working in finance and accounting the last eight years, and his wife was an adjunct professor and administrator for the last seven years. (*Id.* 37-38.) At least two other jurors without Hispanic surnames were married and had no children: Juror No. 9 was married to her husband for twenty-eight years and had no children, received a bachelor's degree in child development and teaching and a master's degree in teaching and taught for twenty years, and her husband owned an agricultural manufacturing company (*id.* 36-37); Juror No. 18 was married to her husband for nineteen

years, didn't have children, had a B.S. in dental hygiene and had been a hygienist since 1981, and her husband had been dentist since 1982. (*Id.* 46-47.) Nothing distinguished Juror No. 11 from other jurors without Hispanic surnames with similar backgrounds, especially when combined with the fact that Juror No. 9, like Juror No. 11, was the victim of a crime.

As for Juror No. 12, when the potential jurors were asked if they, any family members, or any close acquaintances had been arrested for any offenses, Juror No. 12 stated she had family and acquaintances who had been arrested for driving under the influence, as well as some acquaintances that had been arrested for drugs and weapon possessions. (RT 21.) Juror No. 12 stated that they were treated fairly and there was nothing in those experiences that would make it difficult for her to be fair and impartial to both sides. (*Id.* 21-22.) Other potential jurors without Hispanic surnames had family or friends involved with criminal charges: Juror No. 2 had a daughter who was arrested for a DUI ten years prior, expressed some reservation about her daughter's penalty, but acknowledged that it would not affect her judgment in Petitioner's case (*id.* 19-21); Juror No. 17 had a son with drug charges, acknowledged that his son was treated fairly, and that he would be fair and impartial (*id.* 22). Here, it is difficult to see a meaningful difference between Juror No. 12's answers and other jurors without Hispanic surnames that had family with drug or driving under the influence charges.

When the potential jurors were asked if any of them, their family members, their friends, or their acquaintances had been the victims of any crime, Juror No. 12 stated her godfather's son was murdered a few years prior in Arizona. (RT 27.) The victim was stabbed, and Juror No. 12 recalled someone was arrested and acknowledged that she believed justice had been served, but did not follow up on whether the suspect was convicted. (*Id.*) Juror No. 12 did not have any complaints with how the case was handled, and acknowledged to being able to be fair and impartial with Petitioner's case. (*Id.*) As discussed with Juror No. 11, *supra*, other jurors without Hispanic surnames had been or known victims of a crime more and/or less heinous than Juror No. 12's, such as Juror No. 1's daughter being severely assaulted ten years prior and still in recovery. (*See id.* 28-29.)

Juror No. 12 also elaborated on her background: she was married for ten years, had no children, finished high school and had a year of college, and had been working during the past ten years as a community health aid. (RT 38.) Juror No. 12's husband only finished elementary school and was

17

currently working on their ranch, and prior to that worked for a company that made barrels. (*Id.*) As stated previously, at least two other jurors without Hispanic surnames were married and had no children: Juror No. 9 and Juror No. 18.

In concluding the comparative juror analysis, the Court notes that the trial court asked a multitude of questions, and both those jurors with and without Hispanic surnames answered many of those questions in the affirmative. There were jurors without Hispanic surnames that were similarly situated with Juror No. 11 and Juror No. 12, and comparative juror analysis does not reveal why the prosecutor chose to strike those jurors. This adds to the inference of discrimination. *Collins*, 551 F.3d at 922. However, Juror No. 7 did not respond to questions with regard to being the victim of a crime or knowing someone who had been a victim, or to questions of being arrested for a crime or knowing someone who had been arrested. This, coupled with the fact that there were no jurors without Hispanic surnames that had never been married but had children (although some were divorced or widowed with children), does not add to the inference of discrimination.

Respondent raises several arguments stating that Petitioner has failed to establish a prima facie case. Respondent first cites *Williams v. Woodford*, 384 F.3d 567, 584 (9th Cir. 2004), wherein the Ninth Circuit denied a certificate of appealability to the petitioner's *Batson* claim. (Answer 17.) The court in *Williams v. Woodford* denied a certificate of appealability because the petitioner failed to allege, and the record did not disclose, sufficient facts to indicate that a statistical disparity existed. *Williams v. Woodford*, 384 F.3d at 584. Here, however, Petitioner has provided, and the record also discloses, enough evidence for the Court to conduct a statistical analysis to ascertain an inference of discrimination.

Respondent also argues that the prosecutor did not have any discriminatory intent to remove Hispanics because the victim in this case is Hispanic. (Answer 18); *see, e.g.*, *Hernandez v. New York*, 500 U.S. 352, 369-70 (1989) (finding trial judge could credit prosecutor's explanation that because the victim and prosecution witnesses were Latino, this fact tended to undercut any motive to exclude Latinos from the jury). Although this fact may help to refute the inference of discrimination, Respondent fails

to acknowledge that Petitioner is Hispanic,[11] and that the prosecutor could have had a discriminatory intent to remove Hispanic jurors who could also sympathize with Petitioner. Regardless, this is reason to proceed to the second step of the *Batson* analysis, as it is the prosecutor's actual race-neutral reasons, and not hypothetical or court-conjured reasons, that satisfy the prosecutor's burden at step two. *See Paulino v. Harrison*, 542 F.3d 692, 699 (9th Cir. 2008) ("*Batson*'s step two requires evidence of the prosecutor's *actual* reasons for exercising her peremptory challenges."); *see also Batson*, 476 U.S. at 96-98; *Williams v. Runnels*, 432 F.3d at 1108 ("[T]o rebut an inference of discriminatory purpose based on statistical disparity, the 'other relevant circumstances' must do more than indicate that the record would support race-neutral reasons for the questioned challenges.").

Respondent finally argues that Hispanics still remained on the final jury. (Answer 18.) Although this helps to refute an inference of discrimination, it is insufficient to explain the disproportionate impact of the prosecutor's strikes, his lack of questions to Hispanic-surnamed jurors, and the result of the Court's comparative juror analysis. In addition, seated minority jurors do not necessarily dispel the inference of discrimination made by striking minority prospective jurors. *See Turner*, 63 F.3d at 811-13.

In reviewing the "totality of the relevant facts," (1) statistical analysis showing a disproportionate amount of strikes aimed at Hispanic-surnamed jurors, (2) the lack of prosecutorial questions to these jurors, (3) comparative juror analysis revealing little difference between Juror Nos. 11 and 12 and other similarly situated jurors without Hispanic surnames, and (4) the answers given by each of Juror Nos. 7, 11, and 12 seemly not suggesting a predisposition toward Petitioner or a bias against the government, indicate that Petitioner has provided evidence that "gives rise to an inference of discriminatory purpose" in the prosecutor's use of peremptory challenges against prospective jurors with Hispanic surnames. *Johnson*, 545 U.S. at 168. Although statistical analysis alone provides the inference of discriminatory purpose, the prosecutor's lack of questions, comparative juror analysis, and the stricken jurors' answers support, and do little to refute, this inference. Furthermore, as discussed, Respondent points to little

---

[11]    Petitioner's surname, Buchanan, does not appear to indicate Hispanic ethnicity. However, Petitioner's Probation Report indicates "Race: H" (*see* CT 116), and separately states that the victim "stated a *Hispanic male* opened his passenger side door, got in the seat and pulled out an approximate six to seven-inch knife and ordered him out of the vehicle. [The victim] stated the *Hispanic male* told him, 'Get . . . out and give me your wallet'" (*see id.* 118) (emphasis added). The 911 tape also indicates that the victim referred to the Petitioner as "Mexican . . . Hispanic." (CT 47.)

other evidence to refute the inference of discrimination, particularly in light of the low bar Petitioner must hurdle to show an inference of discriminatory purpose. *See Johnson*, 545 U.S. at 170 ("We did not intend the first step to be so onerous that a defendant would have to persuade the judge-on the basis of all the facts, some of which are impossible for the defendant to know with certainty-that the challenge was more likely than not the product of purposeful discrimination."); *United States v. Chinchilla*, 874 F.2d 695, 698 n.5 (9th Cir. 1989) ("[A]lthough the striking of one or two members of the same racial group may not always constitute a prima facie case, it is preferable for the court to err on the side of the defendant's rights to a fair and impartial jury.").

Accordingly, and for the foregoing reasons, the Court finds that Petitioner has made a prima facie case that the prosecutor utilized his peremptory challenges on the basis of race. *Batson*, 476 U.S. at 96-98. Therefore, the Court must proceed to step two of the *Batson* analysis. *See id.* at 98. Because the prosecutor was not afforded the opportunity to provide a race-neutral explanation for the peremptory challenges, an evidentiary hearing must be conducted to ascertain the prosecutor's actual reasons for exercising his peremptory challenges. *See Paulino v. Castro*, 371 F.3d 1083, 1092 (9th Cir. 2004) (requiring district court to conduct evidentiary hearing to allow State to offer prosecutor's actual race-neutral explanation for peremptory strikes after petitioner made prima facie *Batson* violation).

### Claim Two

In his second and final claim, Petitioner asserts that use of his prior juvenile adjudications as a sentencing enhancement violated his right to jury trial under the Sixth Amendment. (Pet. 4, 32-43). Because resolution of the *Batson* claim may affect Petitioner's jury trial claim, the Court declines to address the jury trial claim at this time.

///

///

///

///

///

///

///

## CONCLUSION AND ORDER

For the foregoing reasons, IT IS HEREBY ORDERED that:

1. The Office of the Federal Defender is appointed to represent Petitioner in connection with all future proceedings in this matter, *see* 18 U.S.C. § 3006A(a)(2)(B), 28 U.S.C § 2254 R. 8(c);

2. The Clerk of Court is directed to serve a copy of this order on the Office of the Federal Defender at 2300 Tulare Street, Suite 330, Fresno, California, 93721;

3. Counsel for Petitioner shall serve and file a Notice of Appearance within fourteen (14) days of the date of this order, notifying the Court, Respondent, and Petitioner of the name of the attorney who will have principal charge of the case, together with the address where the attorney may be served, and the attorney's telephone and facsimile number;

4. Counsel for Petitioner shall contact the Clerk of Court to make the necessary arrangements to have the case file copied;

5. Counsel shall appear for a status conference before the undersigned on **April 20, 2009**, at **8:15 a.m.**, in Courtroom 4, 7th Floor, 2500 Tulare Street, Fresno, California, 93721. Counsel may appear telephonically by arranging a one-line call and dialing (559) 499-5680. Counsel shall be prepared to discuss (a) proposed dates for further briefing, if necessary, on relevant issues; (b) a proposed schedule for the evidentiary hearing; and (c) any other matters regarding the status of this action or future proceedings that counsel believe should be addressed by the Court.

IT IS SO ORDERED.

**Dated:**    **March 31, 2009**              /s/ Lawrence J. O'Neill
                                     UNITED STATES DISTRICT JUDGE